The majority opinion, applying a rule of strict construction to the Alabama Chemical Test for Intoxication Act (Code 1975, §32-5-190, et seq.), the so-called "Implied Consent" law, correctly proves that an embalmer is not authorized to draw blood from a dead body under the provisions of that law, and correctly concludes that the statutory presumption ofintoxication provided for in that law would be inapplicable in this case because the blood sample was not drawn by a person authorized under the "Implied Consent" law to draw the blood sample. In other words, the majority correctly makes a distinction between the admissibility of evidence under traditional rules of evidence and a statutory presumption onthe effect of evidence. I, therefore, concur in those portions of the majority opinion which conclude that the statutorypresumption of intoxication provisions of the "Implied Consent" law were not available in this case, and I also concur in those portions of the majority opinion which conclude that the results of a chemical test of blood is admissible, whether thepresumption of intoxication *Page 978 
is available or not, provided a proper predicate is laid. I dissent from that portion of the opinion which holds that a proper predicate was not laid in this case.
The plaintiff filed a motion in limine to exclude the evidence of the results of the blood sample.
Larry Jones, a licensed embalmer and funeral director, testified at the hearing on the motion in limine and also at trial. Jones testified, at trial, that he took the blood sample from the dead body of Thomas McGough at the request of a State trooper and explained in some detail how he drew the blood sample. He testified:
 Q. All right, and did you get it in a tube of some kind, or what?
A. I got it in a regular blood sample tube, a vial.
 Q. All right, had that tube been cleaned out, cleaned thoroughly before you put Mr. McGough's blood in it?
 A. It was packaged. I purchase the tubes of this nature from the local drug store, and it was packaged, and I took it out of the package and put the blood in it.
Q. In other words, it never had been used?
A. No.
 Q. Was it, in your judgment, uncontaminated with any foreign matter whatsoever?
A. In my judgment, it was.
Q. And, did you seal it up?
A. Yes, sir, and tagged it.
Q. Sealed it and tagged it?
A. With my name, date and my signature.
On cross examination, Jones testified:
 A. The blood that I collected — the first blood that came from the jugular vein went into the blood sample vial.
Q. How did you get it from the vein into the vial?
 A. By placing the vial to the opening in the vein where I had made the incision, then placing pressure from the lower part of the vein, then —.
Q. Where did you cut him, on his neck, or arm —?
 A. The right common carotid artery, was what was raised.
 Q. All right, so what ever else was in that area was also picked up in the test tube?
 A. The sample was taken from that area, the test tube had to touch that area, yes.
Q. But, you do not use a jugular tube at all?
A. Yes, I did, after —.
 Q. To actually get the blood from the body into the container?
 A. I did not use that at all to get the blood into the container, no.
 Q. You just took a test tube and stuck it up to where you cut a hole, and you got the blood out, is that correct?
A. That's correct.
 Q. Okay, you didn't clean that area around there before you cut the man?
A. No, sir.
Q. You didn't sterilize it at all?
A. No, sir.
 Q. And, I believe you testified that you received no instructions, no training at all from the Alabama State Board of Health, of any rules or regulations that they may have promulgated regarding the preservation of blood samples?
A. That's correct, I have not.
Plaintiff's attorneys made the following specific objections:
 BY MR. THORNTON: Judge, at this point, we would object to Mr. Jones's testimony and ask it to be excluded, and any other testimony regarding this blood sample. Based on his testimony, Mr. Jones clearly stated that the procedures were not used to insure that the blood sample was kept in an uncontaminated state. Mr. Jones testified on cross examination that he had received nothing from the State Board of Health as to how to *Page 979 
properly preserve the blood, how to keep it from becoming contaminated, he testified that it laid out there on a table some hour and fifteen minutes before it was delivered to Trooper Hammonds, and we feel that unless the Defendants in this case can show that this blood was kept in an uncontaminated state and that it was withdrawn properly, that any other testimony that they may have, according to both these statutes that we cited in our previous motions, and they both require the proper drawing of the blood, and a proper preservation of it, and I submit that when you use a test tube to make a cut on somebody's body, then just stick it up there without sterilizing it, without doing anything, that you certainly have a strong possibility of contamination of that sample, and that would invalidate any tests that may be later run on it.
 BY MR. WILSON: Your Honor, secondly, we would again note that the Code of Alabama, 32-5-193-C, notes only certain people who are authorized to take blood tests for the purposes of determining the amount of alcohol content therein, and Mr. Jones has clearly stated he is not one of these people.
 BY MR. THORNTON: Yes, and one purpose of this statute, which is 32-5-193, and — well, the entire statute is to insure that the specimens will be taken according to proper procedures and to insure that no contaminants could be in the specimen, and we submit to Your Honor again that 22-19-80 and 81 are strictly to allow the blood to be taken. It says nothing about admissibility later in Court. If you will look at this particular statute, 32-5-191 —
BY MR. WILSON: And, 193.
 BY MR. THORNTON: It says the reason is to make sure that the procedure is followed to be sure that there is no contamination.
 BY THE COURT: I think that 193 has to do with the presumptions that follow. I don't think they are entitled to any of the presumptions that go with it, but I think they are entitled to take it, and your motion is denied. [Emphasis supplied.]
The record also shows that a state toxicologist who examined the blood sample testified as follows:
Q. Did you test it?
A. Yes, sir.
 Q. Would you tell us the blood alcohol content that you found?
 A. Yes, sir, I identified ethyl alcohol in the specimen at a level of .18 grams percent by weight.
 Q. All right, would blood taken by cutting an artery and placing a vial in the area where the blood would drain directly from the artery into the vial, is that an accepted way of taking blood?
 A. That is not the normal way, but I do not see how it could have contaminated the same.
 Q. Now, in your judgment, that sample taken in that fashion would be uncontaminated?
BY MR. ESPY: Objection.
 BY THE COURT: Overruled, this man is an expert, he can testify.
By Mr. Black:
 A. In this particular case, I do not see where it would contaminate it, as far as ethyl alcoholic content.
 Q. All right, Mr. Adair, what level of blood alcohol is considered intoxicating?
BY MR. THORNTON: Objection.
BY THE COURT: Sustained.
By Mr. Black:
Q. .18 level of — did you say ethyl alcohol?
A. Yes, sir.
Q. What is the source of ethyl alcohol?
A. It is the source of the fermentation of sugar.
Q. Is it what we commonly call whiskey or beer?
 A. Those are two sources of it, there are many others, however.
 Q. Do you have a judgment as to whether or not a person with .18 grams of ethyl alcohol would be drunk or not? *Page 980 
BY MR. THORNTON: Objection.
By Mr. Black:
Q. And, based upon your experience and training —
 BY THE COURT: Sustained, I'll let you ask him what a man — what actions a man like that could do.
By Mr. Black:
 Q. Could you describe what actions a man with that level of alcohol in his blood would be able to perform?
 BY MR. THORNTON: Objection, no proper predicate to ask that question.
BY MR. BLACK: He's an expert, Your Honor.
 BY MR. THORNTON: I don't think he's an expert on the effects of alcohol on each individual person.
 BY THE COURT: If he can testify that he knows what they are, I'll let him answer.
By Mr. Black:
Q. Do you know what the effects that this would have?
 A. Well, first of all, I'd like to say that there are broad ranges for these. In this particular area, generally you would have mental confusion, lack of coordination, and inability to perform certain learned skills efficiently.
Q. Would it affect his driving?
A. Yes, sir, in my opinion, it would.
Q. Would it affect his judgment?
A. Yes, sir.
Q. How about reaction time?
A. Yes, sir.
 Q. Would it be considered driving under the influence of liquor?
BY MR. THORNTON: Objection.
BY THE COURT: Sustained.
BY MR. BLACK: That's all.
Based on the foregoing, I am completely convinced that a proper predicate was laid to permit the introduction into evidence of the blood sample. Consequently, I must respectfully dissent from the conclusion by the majority that no proper predicate was laid.
ALMON and ADAMS, JJ., concur.